**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 10-cv-02097-MSK-CBS

**MARCUS RICHARDSON,**

      **Plaintiff,**

**v.**

**DENNIS GALLAGHER, in his official capacity as Auditor, and in his individual capacity;**
**JOHN CARLSON, in his official capacity as Deputy Director of Audit Services, and in his individual capacity;**
**DAWN SULLEY, in her official capacity as Deputy Auditor, and in her individual capacity;**
**DENVER AUDITOR'S OFFICE; and**
**CITY AND COUNTY OF DENVER,**

      **Defendants.**

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

      **THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (**#70**), Mr. Richardson's response[1] (**#73**), and the Defendants' reply (**#87**); and Mr. Richardson's Motion to Seal (**#92**), to which the Defendants responded (**#94**). Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## FACTS

---

      [1]Mr. Richardson's Response brief is supplemented by his Motion for Leave to File Supplement to Response to Motion for Summary Judgment (**#110**), which was granted. Although submission of the exhibits is untimely, the Court has considered them. However, new arguments in his supplemental brief that could have been asserted in his Response brief have been disregarded.

For purposes of this summary judgment motion, the Court finds the following facts to be either undisputed or, where in dispute, resolves that dispute in favor of Mr. Richardson.[2]

Mr. Richardson, a black male, was an employee at the Auditor's Office for the City of Denver from 1983 to November 15, 2010, eventually holding the job title of Internal Audit Supervisor.  In that role, Mr. Richardson managed a team of subordinates, jointly working on audits. Until an office reorganization in 2008, Mr. Richardson performed contract compliance audits for the City's Department of Aviation.  A contract compliance audit simply compared the contractor's performance with the contract's terms and conditions.

In January 1, 2008, as a result of a voter-approved change in the purpose of the Auditor's Office, auditors also began to do "performance audits, assessing whether governmental agencies had met its project objectives efficiently and effectively in various respects.  The 2008 reorganization also resulted in supervisory changes in the office.  Kip Memmott was promoted to the position of Director of Audit Services, two levels above Mr. Richardson; in or about December 2008, Mr. Memmot hired John Carlson as Deputy Director of Audit Services, the position directly supervising Mr. Richardson.  Mr. Memmott was of the opinion that the Auditor's Office was capable of improving its performance in various respects, including quality control issues, poor writing skills, and untimely issuance of audit reports.

Although Mr. Richardson had previously received job performance ratings of "exceptional," his first performance reviews under the new regime, conducted in May 2008,

---

[2]However, it should be noted that the Court considers only those facts that are supported by citation to evidence that would appear to be admissible at trial.  Averments not supported by citation to evidence, or statements in affidavits that do not appear to be made upon the basis of personal knowledge of the affiant, are not properly before the Court. Fed. R. Civ. P. 56(c)(1)(A), (4).

resulted in an overall rating of "successful," a rank below "exceptional."[3]  Those evaluations indicated that Mr. Richardson should attempt to improve himself in areas relating to accepting responsibility for his own work, providing more coaching and mentoring to his team, and timely completing audits.  Notwithstanding the evaluations' criticisms, in 2008 and 2009, Mr. Richardson's team completed more audits than any other audit team and succeeded in identifying more money owed to the City than any other auditor teams.

Mr. Richardson was evaluated again in May 2009, this time by Mr. Carlson, and again, was rated "successful" and invited to improve his performance in various respects.  Mr. Richardson responded to this evaluation with a written memo, distributed to Mr. Carlson and Mr. Memmott (among others), disagreeing with Mr. Carlson's conclusions and offering explanations of certain events.  The memo also mentioned that "as a Black male supervising and working with a diverse group of colleagues, it can be somewhat difficult because employees come from different backgrounds and cultures and in many cases do not always understand or want to understand persons different from themselves.  In this rating period, I believe my supervisor has placed a higher standard on me because of this lack of understanding."  Mr. Richardson stated his intention "to maintain the same level of excellence I have demonstrated over the years" and "to make any improvements that are necessary."  He stated that "some level of understanding is needed by all persons affected here through developing an understanding of the cultures of someone different than themselves" and recommended that "we initiate some action that will assist us all to increasing the level of understanding, tolerance, and patience with others. . . ."  He

---

[3]Mr. Richardson's direct supervisor as of the May 2008 evaluation was Dick Wibbens. Mr. Carlson had not yet been hired.

also requested an independent evaluation of Mr. Carlson's ratings of him.[4]

Mr. Richardson and his team undertook several audits in 2009 that were not completed on time.  (Mr. Richardson attributes this to a team member who did not timely complete her work.)  In his May 2010 evaluation, he again received a rating of "successful," along with criticisms and suggestions for improvement, including the need to meet deadlines, his written work product, and the type of evidence he used to support audit conclusions.

In or about August 2010, Mr. Carlson was still dissatisfied with certain aspects of Mr. Richardson's performance and decided to place Mr. Richardson on a "performance improvement plan" ("PIP").  Under the PIP, Mr. Richardson would be relieved of supervisory responsibilities, would be given specific goals and objectives to accomplish, and would be required to meet weekly with Mr. Carlson and another supervisor on a weekly basis to discuss his progress and performance.

The first weekly meeting after imposition of the PIP (a meeting at which Mr. Carlson removed certain duties from Mr. Richardson) was apparently heated, and Mr. Memmott states

---

[4]Mr. Memmott, apparently aggrieved by the implications of racial discrimination in Mr. Richardson's memo, prepared a written response that was placed in Mr. Richardson's personnel file.  The response "seeks to clarify the situation bu presenting additional information related to the Division's history and process for rating supervisors and my observations related to Marcus Richardson's performance."  In summary, the document reflects Mr. Memmott's agreement with the criticisms and suggestions for improvement in Mr. Richardson's 2008 and 2009 evaluations.

The parties have become embroiled in a side dispute about the date of this memo.  The Defendants contend that Mr. Memmott created it shortly after Mr. Richardson's May 2009 memo, but Mr. Richardson points out that the document bears a date of September 14, 2010, shortly after Mr. Richardson commenced this action.  The Defendants respond that the date on the document is the result of improper use of an auto-dating function in the word processor used to create the document that resulted in the document bearing the date it was retrieved and printed, rather than the date it was written.  For purposes of this matter, the Court will assume that Mr. Richardson is correct and the memo was written in September 2010.  Ultimately, however, the date on which the memo was written is of no particular significance.

that after that meeting, two of the participants complained that Mr. Richardson had behaved in an "intimidating and threatening" manner, "pointing his finger in [one participant's] face" and pacing the room in frustration while complaining that he was being treated unfairly.  As a result, the Defendants issued Mr. Richardson a written reprimand.  Mr. Richardson, not surprisingly, disagrees with the characterizations of his behavior and the propriety of a reprimand, and contends that the reprimand was issued in retaliation for him having allegedly complained earlier about Mr. Carlson, Mr. Memmott, and others to the City Auditor.

Mr. Richardson commenced this action shortly after receiving the written reprimand, while still employed with the Auditor's Office.  In early September 2010, Mr. Memmott wrote to the Human Resources office, requesting that it "perform a 'trend analysis'" of employee ratings both pre- and post-2008, to be used as evidence to rebut Mr. Richardson's contentions that the office has "inconsistently addressed the performance of [employees] . . . in a discriminatory manner."  The memo stated that "the trend analysis should[5] clearly demonstrate that the documented performance of several supervisors . . . declined and that these performance issues were clearly documented."  Meanwhile, the parties continued having weekly meetings to address Mr. Richardson's PIP.  During those meetings, Mr. Carlson and others continued to criticize some aspects of Mr. Richardson's work performance and assigned or removed tasks from Mr. Richardson.  Mr. Richardson refused to sign the reports that resulted from these meetings,

---

[5]Mr. Richardson seems to believe that the word "should" here is an instruction – *i.e.* directing the Human Resources office to create an analysis meeting Mr. Memmott's specifications.  However, it appears that Mr. Memmott's use of the word "should" was more in the sense of expectation – *i.e.* that he believed a fair analysis would be likely to demonstrate that the post-2008 evaluations were proper and non-discriminatory.  Ultimately, the Court finds that this communication does not meaningfully bear on Mr. Richardson's claims.

disagreeing with the criticisms of him.

On October 27, 2010, the Auditor's Office notified Mr. Richardson that it was considering terminating his employment as a result of his failure to demonstrate adequate improvement under the PIP.  It scheduled a hearing on November 8, 2010 to permit Mr. Richardson to present any evidence he has contradicting the office's records or to make a statement of his position.  Mr. Richardson submitted a written response, addressing certain contentions and pointing out recent instances in which he contends he demonstrated exemplary work.  Nevertheless, on November 15, 2010, the Auditor's Office terminated his employment, citing carelessness in performance of duties and failing to meet performance standards.[6]

Mr. Richardson's current pleading, the Second Amended Complaint (**# 40**), essentially alleges three claims: (i) a violation of 42 U.S.C. § 1983, in that the Defendants violated his constitutional guarantee of Equal Protection by engaging in racial discrimination against him; (ii) violation of 42 U.S.C. § 1981, again sounding in race discrimination and retaliation; and (iii) a claim of "negligent hiring" under § 1983, apparently intended to give rise to municipal liability for the constitutional violations committed by the individual defendants.

The Defendants move (**# 70**) for summary judgment on Mr. Richardson's claims, as set forth below.

## ANALYSIS

---

[6]Although termination usually brings the factual recitation of Mr. Richardson's employment to an end, in this case, there is a brief postscript.  At some point in time, the Auditor's Office posted Mr. Richardson's photo on the bulletin board, along with instructions that he not be allowed to enter the office.  It appears that this was the result of a dispute over whether or not Mr. Richardson had returned his access pass for the office.

### A.  Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

When the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### B.  Discrimination claims

Mr. Richardson's race discrimination claims under both § 1981 and § 1983 are analyzed

according to the same burden-shifting framework used for Title VII claims.  *Carney v. City and*

*County of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008).  Mr. Richardson must first establish a

*prima facie* case of discrimination by showing: (i) that he is a member of a protected class; (ii)

that he suffered an adverse action; and (iii) that the adverse action occurred in circumstances

giving rise to an inference of discrimination.  *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th

Cir.2007).  If he does so, the burden shifts to the Defendants to articulate a legitimate, non-

discriminatory reason for the adverse action, and Mr. Richardson then bears the ultimate burden

of demonstrating that the Defendant's proffered reason is merely a pretext for discrimination.  *St*

*Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993).

The Court will not linger over the question of whether Mr. Richardson has demonstrated

a *prima facie* case.  It is undisputed that, as a black male, Mr. Richardson is a member of a

protected class.  Although the Court is not necessarily persuaded that some of the acts taken

against him constitute adverse employment actions, [7] it finds that Mr. Richardson has adequately

demonstrated at least two events that are sufficiently adverse to support a *prima facie* case: (i)

his termination, and (ii) his placement on a PIP, accompanied by a significant reduction in the

---

[7]For example, the issuance of a written reprimand is not generally considered to be an adverse employment action absent some showing – a showing Mr. Richardson does not make here – that it effected some other significant change in his employment status.  *See DeWalt v. Meredith Corp.*, 288 Fed.Appx. 484, 493 (10th Cir. 2008) (unpublished).  Similarly, a performance evaluation that rates an employee as satisfactory is not generally considered an adverse action, even though the employee may believe that he warranted a higher ranking.  *See e.g. Rennard v. Woodworker's Supply, Inc.*, 101 Fed.Appx. 296, 308 (10th Cir. 2004) (unpublished); *Amro v. Boeing Corp.*, 232 F.3d 790, 799 (10th Cir. 2000).

scope and nature of his assignments and duties.  *Compare Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1224-25 (10th Cir. 2006) ("a PIP, standing alone, is not an adverse employment action," but might rise to that level if it is accompanied by, for example, a significant modification in the employee's responsibilities).  Finally, the Court finds that Mr. Richardson has demonstrated circumstances giving rise to an inference of discrimination, at least sufficient to meet the minimal showing required of him at the *prima facie* stage.  *McCowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 921-22 (10th Cir. 2001) (burden on plaintiff of establishing *prima facie* case is "not onerous").  Among the various ways that an employee can show circumstances giving rise to an inference of discrimination are that, post-termination, he was replaced by a person outside the protected class, as occurred here.  *See Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005).

The Court then turns to the Defendants' burden of articulating a legitimate, non-discriminatory reason for placing Mr. Richardson on a PIP and, ultimately, terminating him.  The Defendants have contended that Mr. Richardson's work performance was not sufficiently satisfactory and did not sufficiently improve over the life of the PIP.

Thus, the Court turns to Mr. Richardson's burden to show that the Defendants' proffered reason is a pretext for discrimination.  In doing so, the Court pauses briefly to acknowledge the obstacles facing Mr. Richardson on this point.  Although statutes like Title VII, § 1981, and §1983 prohibit race discrimination in employment, they do not protect employees against management decisions that, although not racially-motivated, are unwise, illogical, seemingly arbitrary, or even downright unfair.  *Adamson v. Multi Community Diversified Services*, 514 F.3d 1136, 1153 (10th Cir. 2008); *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 986 (10th Cir. 1996).

It is often stated that anti-discrimination laws do not entitle the Court to "act as a super-personnel department to undo bad employment decisions" or to second-guess employers' business judgment. *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010); *Turner v. Public Service Co.*, 563 F.3d 1136, 1144 (10th Cir. 2009); *Santana v. City and County of Denver*, 488 F.3d 860, 865 (10th Cir. 2007).  Moreover, when the dispute turns on the question of whether an employee's job performance was satisfactory, the Court looks to the **subjective** state of mind of the decisionmaker (and necessarily disregards the employee's own subjective assessment of his performance).  *Luster v. Vilsack,* 667 F.3d 1089, 1093 (10th Cir. 2011); *Bullington v. United Air Lines, Inc.*, 183 F.3d 1301, 1318 (10th Cir. 1999).  Once again, the inquiry is not whether the decisionmaker's reasons for the decision were fair, wise, or even correct, but merely whether the decisionmaker "honestly believed those reasons and acted in good faith upon those beliefs." *Bullington*, 183 F.3d at 1318.

Mr. Richardson is not entirely helpless against such a formidable burden.  Recognizing that an employer's subjective assessment of employees can conceal racial prejudice, courts have sometimes looked skeptically on employment decisions that were made purely on the basis of subjective criteria.  The Court will not reflexively reject an employer's justification for an adverse action where that justification is founded on subjective criteria, *Santana*, 488 F.3d at 866 ("subjective considerations are not unlawful *per se*"), but will review those criteria on a case-by-case basis. *Tuner*, 563 F.3d at 1145.  Recognizing that employment decisions based on qualifications or performance will inherently require some subjective evaluation by employers, courts typically infer that a decision justified by such subjective criteria is pretextual only in circumstances where the criteria at issue are "entirely subjective." *Id.*, *citing Jones v. Barnhart*,

349 F.3d 1260, 1267-68 (10th Cir. 2003).

Here, the Court cannot say that the criticisms leveled against Mr. Richardson, both leading up to the imposition of the PIP and those that continued through to his termination, are entirely subjective in nature.  The letter embodying the PIP itself points out that Mr. Richardson failed to meet several fixed deadlines on certain audits, and directs him to achieve improvement in "completing . . . audits early or on time," ensuring "deliver[y of] projects in a timely manner," giving "timely notification to colleagues," and "ensuring co-workers have awareness of when tasks will be completed."  These are all objectives that can be evaluated somewhat or entirely objectively.  Similarly, the pre-termination letter, which discusses certain observations by the Defendants from the various weekly meetings with Mr. Richardson during his PIP, also indicates several objectively-ascertainable defects in Mr. Richardson's performance, including the failure to submit a red-lined version of a modified report, grammatical errors in a draft report, and the fact that members of Mr. Richardson's team had complained to management about his rewriting of reports without their input.[8]  Thus, although it is clear that the Defendants' evaluation of Mr. Richardson's performance necessarily entailed some application of subjective criteria, the record reflects that other documented criticisms reflects objective assessments of errors and omissions by Mr. Richardson, such that the Court cannot simply infer pretext due to the Defendants applying purely subjective criteria to him.

To show that the Defendants' justification for placing him on a PIP and eventually terminating him are a pretext for discrimination, Mr. Richardson must show "such weaknesses,

---

[8]In this regard, the substance of the team members' complaints might be subjective, but the fact that complaints had been made to management about Mr. Richardson by his team members are objectively ascertainable.

implausibilities, inconsistencies, incoherencies, or contradictions" in those reasons that "a reasonable factfinder could rationally find them unworthy of credence." *Jaramillo v. Adams County School Dist.*, 680 F.3d 1267, 1269 (10th Cir. 2012).  Often, an employee may attempt to make such a showing by demonstrating that similarly-situated individuals outside the protected class received more favorable treatment.  *Id.*  Here, Mr. Richardson contends that he is similarly-situated to co-workers such as Nancy Howe, a white female.[9]  However, it is undisputed that, like Mr. Richardson, Ms. Howe was placed on a PIP and eventually removed from her position.[10]

Mr. Richardson also contends that similarly-situated white employees like Mike Widner and John Finamore also missed deadlines, yet were not placed on a PIP by Mr. Carlson.  Assuming – without necessarily finding – that Mr. Widner and Mr. Finamore demonstrated the same alleged performance deficiencies that Mr. Richardson did,[11] the record nevertheless

[9]The Defendants contend that because Ms. Howe was supervised by someone other than Mr. Carlson, she is not similarly-situated to Mr. Richardson.  *See McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) ("similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation").  Nevertheless, the Court will accept Mr. Richardson's contention.

[10] Mr. Richardson apparently believes he was treated differently than Ms. Howe because she was not terminated and he was.  However, the record indicates that, during the PIP process, Ms. Howe's supervisor found her capable of performing less-demanding work and Ms. Howe successfully applied for an open position in the Auditor's Office that was commensurate with those demands.  Mr. Richardson has not contended that there was an open position that matched the skills that the Defendants found him to possess, much less that he applied for such a position.  Thus, he is not comparable to Ms. Howe in this respect.

[11]Mr. Widner and Mr. Finamore received the "exceptional" rankings on their 2008 performance evaluations, whereas Mr. Richardson saw his ranking drop to "successful."  Notably, those evaluations were conducted by Mr. Wibbens, Mr. Carlson's predecessor.  Mr. Carlson's first round of evaluations, conducted in 2009, rated all three men as "successful."  Thus, if anything, the evaluations reflect that Mr. Carlson judged the white employees more harshly than Mr. Wibbens had, but did not reduce the ranking that Mr. Richardson had been

indicates that they were not treated materially differently than Mr. Richardson.  Mr. Richardson

was not placed on the PIP until August 2010, more than a full year after Mr. Carlson assumed

supervision over him.  By that time, Mr. Finamore and Mr. Widner were no longer employed by

the Auditor's Office, both men having left its employ in 2009, within a few months of Mr.

Carlson's appointment as supervisor.  In other words, Mr. Carlson observed Mr. Richardson's

performance (and its alleged deficiencies) for more than a year before deciding to place Mr.

Richardson on a PIP; Mr. Carlson did not have an opportunity to observe more than a year's

worth of alleged performance deficiencies by Mr. Widner and Mr. Finamore, nor the opportunity

to place them on a PIP, because they were no longer employed.  Thus, the Court finds that Mr.

Widmore and Mr. Finamore are not similarly-situated to Mr. Richardson for purposes of

examining whether Mr. Richardson's PIP in August 2010 was racially-motivated.

     Without the ability to demonstrate that similarly-situated white employees were treated

more favorably, Mr. Richardson is left to attempt to demonstrate pretext with a grab-bag of

contentions, none of which is sufficient, individually or in concert with the others. He highlights

certain curiosities, such as the alleged backdating of Mr. Memmott's memo responding to his

complaints, or the post-termination posting of his photo on the bulletin board, but these acts,

unorthodox as they may be, do not evidence any racial bias against Mr. Richardson.  Rather, they

reflect an employer's natural and predictable defensive response to an employment situation that

has blossomed into litigation.  Similarly, Mr. Richardson points to his long and distinguished

service with the Auditor's Office and to accolades he received from the agencies he worked

with, but evaluations from prior supervisors and outsiders does not address whether Mr. Carlson

---

given the year before.

or Mr. Memmott **subjectively** shared those opinions of Mr. Richardson's performance.  One might suggest that Mr. Carlson and Mr. Memmott judged Mr. Richardson's performance (and, to some extent, the performance of white employees like Mr. Widner and Mr. Finamore) too harshly than others would have done, but as noted above, the Court is not permitted to overturn an employment decision merely because it is unwise or unfair.  It may be upsetting to Mr. Richardson to realize that long service in the Auditor's Office did not protect him from the arrival of a new supervisor with a more critical eye than Mr. Richardson previously enjoyed, but anti-discrimination laws do not protect employees from the changes in policies or expectations that arrive with new management and new directions.

Thus, in the absence of evidence that Mr. Carlson and/or Mr. Memmott harbored animus against Mr. Richardson because of his race – and the Court finds that Mr. Richardson has not come forward with such evidence – the Defendants are entitled to summary judgment on his race discrimination claims.

### C.  Retaliation claims

Mr. Richardson also asserts claims that he was retaliated against for having complained of race discrimination.  The analysis of a retaliation claim follows a similar burden-shifting framework as that discussed above: the employee has the initial burden of demonstrating a *prima facie* case of retaliation; the employer must respond with a legitimate, non-retaliatory reason for the adverse action; and the employee bears the ultimate burden of showing that the proffered reason is a pretext for retaliation.  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011).

The *prima facie* case for a retaliation claim is somewhat different from the race

discrimination *prima facie* case.  To establish a *prima facie* case of retaliation, Mr. Richardson must show: (i) that he engaged in protected conduct; (ii) that he suffered an adverse employment action[12]; and (iii) that there is a causal connection between the protected conduct and the adverse action.  Once again, the Court finds that Mr. Richardson cannot necessarily demonstrate a *prima facie* case of retaliation relating to all of his alleged protected conduct,[13] but he has sufficiently shown that his November 2010 termination (undisputably an adverse action) was temporally connected to his complaints of discrimination in the form of filing this action in August 2010 and his alleged oral complaints to management thereafter.

However, at this point, the retaliation analysis proceeds along the same lines as the race discrimination analysis.  Because the adverse actions supporting Mr. Richardson's retaliation claims are essentially the same as those underlying his race discrimination claims, the analysis above applies with equal force to the retaliation claims.  The Defendants have articulated a legitimate, non-retaliatory reason for Mr. Richardson's placement on a PIP and termination, and Mr. Richardson has not come forward with sufficient evidence to demonstrate that these reasons are false (much less that they are a pretext for either discrimination or retaliation).  Accordingly, the Defendants are entitled to summary judgment on Mr. Richardson's retaliation claims as well.

### D.  Municipal liability claims

Because the Court finds that Mr. Richardson has failed to demonstrate triable claims

---

[12]The concept of what constitutes an adverse action for purposes of a retaliation claim is somewhat broader than that in a race discrimination claim.  *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006).

[13]For example, Mr. Richardson has not shown that any allegedly adverse action closely followed his May 2009 response to his performance evaluation, even though that response raised some allegations of potential race discrimination.

against any of the individual Defendants, the Court need not address his contentions that the City of Denver shares municipal liability for unlawful actions committed by the individuals.

### E. Motion to Restrict Access

Mr. Richardson has moved **(# 92)** to restrict public access to Exhibits 30, 32-41, and 46 of Docket # 87, the Defendants' reply brief.  Those exhibits primarily consist of references to and/or copies of "performance enhancement program reports" – written performance evaluations – for various non-party employees who have been identified as alleged comparators to Mr. Richardson, or are ancillary documents relating to employees who were placed on improvement plans.  Mr. Richardson seeks to restrict public access to these documents based on two primary arguments: (i) the documents were designated as "confidential" under the parties' Protective Order; and (ii) the documents are "personnel-related information" which "would prove embarrassing to" the employees and "could unnecessarily harm their reputations in the community" if revealed.  D.C. Colo. L. Civ. R. 7.2(B)(2) expressly indicates that the argument premised upon the parties' Protective Order is insufficient, and thus, the Court considers only the latter argument.

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002). There is a presumption that documents essential to the judicial process are to be available to the public, as it is critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral

16

arbiter.  *See United States v. McVeigh*, 119 F.3d 806, 811, 814 (10th Cir. 1997).  However, upon

a sufficiently compelling showing that privacy interests in the materials outweighs the strong

public interest in access, the Court may restrict public access to the records under Local Rule

7.2.

The Court finds that Mr. Richardson has not demonstrated that the private interests in the

noted documents outweighs the public interest.  In evaluating the level of privacy interests and

potential injury at issue here, Local Rule 7.2(B)(3) (party seeking restriction must "identify a

clearly defined and serious injury that would result if access is denied"), the Court finds that Mr.

Richardson's demonstration is largely speculative.  He posits that the non-parties might be

"embarrassed" by disclosure of the evaluations (or perhaps, more remotely, by the documents'

implication  that the employees were placed on a performance improvement plan in the first

instance).  This argument is unpersuasive for several reasons.

First, the fact that each of the employees involved was placed on an improvement plan is

discussed extensively in the substantive briefs of both parties, and yet Mr. Richardson does not

request that the briefs themselves be restricted.  To the extent the employees would be

embarrassed or injured by disclosure of the fact that they were placed on in improvement plan,

that injury will be caused by the parties' briefing regardless of whether the supporting

documentation is restricted or not.

Secondly, for the most part, the documents to which Mr. Richardson seeks to restrict

access are largely favorable to the employees involved.  All of the evaluation forms themselves

rate the employees involved as either "Successful" or "Exceptional."  Exhibit 30, an affidavit

discussing the performance of Nancy Howe during her time on a performance plan, notes that

she was considered to be capable of performing Lead Auditor duties, and that she voluntarily and successfully bid for a position as Lead Auditor.  Thus, the Court has some doubt that these documents, even if disclosed, would cause the employees involved to suffer any injury.[14]

Third, the Court disagrees with Mr. Richardson that no alternative short of restricting access would be sufficient to preserve any privacy interests.  Local Rule 7.2(B)(4) requires the party seeking restriction to demonstrated why alternatives such as redaction or summarization cannot alleviate the need for restriction.  This rule is intended to cause the parties to carefully consider why the information is being presented to the court in the first place, and to think creatively about whether there is a way to achieve that purpose without resorting to a process that shields relevant materials from public review.  Here, the Court does not understand the parties to genuinely dispute the contents of the attached exhibits – *i.e.* that the employees involved were placed on improvement plans, that they were evaluated on particular dates, and that their evaluations awarded particular rankings or made particular comments.  Thus, there is no reason why the parties could not have simply stipulated to these facts,[15] thus alleviating the need to file the exhibits at all.

---

[14]Certain of the documents contain collateral information, such as the employee's salary. Ordinarily, salary information might be considered private (although this information could have been protected via redaction without undermining the reasons for filing the documents). However, because the employer here is a public entity and subject to freedom-of-information requirements, the Court is not comfortable in stating that employee salaries, either at a general or specific level, should necessarily be considered private information.

[15]Once again, the Court reminds practitioners to reflect upon whether they dispute the **existence** of a fact – that is, whether something did or did not actually happen – or the **significance** of that fact – that is, what inferences should be drawn from the fact's existence. Stipulation to the existence of a fact does not preclude a party from disputing the significance of that fact, but it does eliminate the need for parties to put on evidence as to the existence of the undisputed fact.

Balanced against these defects is the undisputable fact that the public interest in this information is high.  The existence of comparators to Mr. Richardson is a major component of both parties' arguments and a factor that strongly bears on the Court's analysis.  As such, there is a heightened public interest in being able to review those facts and materials upon which the Court decided contested issues.  *See Riker v. Federal Bureau of Prisons*, 315 Fed.Appx. 752, 754 (10th Cir. 2009) (unpublished) (noting "strong presumption of access" where the documents are used to determine the litigants' substantive legal rights).

Accordingly, the Court finds that the public interest in access outweighs the privacy interests identified by Mr. Richardson, and his motion to restrict access is denied.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**#70**) is **GRANTED**.  The Clerk shall enter judgment in favor of the Defendants and against the Plaintiff on all claims. Mr. Richardson's Motion to Seal (#**92**) is **DENIED**.

Dated this 24th day of September, 2012

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge